UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

LISA KRAUSE,

                              Plaintiff,

            v.                                                    6:17-CV-1045 (LEK/ATB)

GREG KELAHAN, Superintendent,
Oriskany Central School District, *et al.*,

                              Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

        Plaintiff Lisa Krause brings this action against the Oriskany Central School District (the

"District"), the Oriskany Central School District Board of Education (the "Board") (together

with the District, the "Municipal Defendants"), former District Superintendent Greg Kelahan,

and several current or former members of the Board (together with Kelahan, the "Individual

Defendants"). Dkt. No. 52 ("Amended Complaint"). On April 26, 2018, the Court dismissed

several of Plaintiff's claims, but found that the following claims could proceed: gender

discrimination and hostile work environment under Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e, *et seq.*; gender discrimination and hostile work environment under the New

York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290, *et seq.*; and, pursuant to 42

U.S.C. § 1983, gender discrimination in violation of the Equal Protection Clause of the United

States Constitution. Dkt. No. 49 ("April 2018 MDO"); see also Dkt. Nos. 16 ("Municipal

Defendants' Motion to Dismiss"); 43 ("Individual Defendants' Motion for Judgment on the

Pleadings"). In the same decision, the Court also granted Plaintiff's request to file the Amended

Complaint, see Dkt. No. 22, noting that the "claims dismissed by [the April 2018 MDO] shall remain dismissed." Apr. 2018 MDO at 37.[1, 2]

After proceeding through discovery, all Defendants filed a single motion for summary judgment. Dkt. No. 78 ("Summary Judgment Motion" or "SJ Motion"); see also Dkt. Nos. 78-46 ("SJ Memorandum"); 78-45 ("Defendants' Statement of Material Facts" or "Defendants' SMF"). Plaintiff opposed Defendants' Summary Judgement Motion, Dkt. No. 83-11 ("Response"); see also Dkt. Nos. 83-9 ("Plaintiff's Responsive SMF"); 83-10 ("Plaintiff's Additional SMF"), and Defendants filed a reply. Dkt. No. 90-8 ("Reply"); see also Dkt. Nos. 90-6 ("Defendants' Reply to Plaintiff's Responsive SMF"); 90-7 ("Defendants' Response to Plaintiff's Additional SMF"). Defendants have also filed two motions requesting that the Court strike various affirmations and documents submitted by Plaintiff. Dkt. Nos. 87 ("First Motion to Strike"); 100 ("Second Motion to Strike") (together, "Motions to Strike"); see also Dkt. No. 96 ("Response to First Motion to Strike").

For the reasons that follow, Defendants' Summary Judgment Motion is granted in part and denied in part. Defendants' Motions to Strike are also granted in part and denied in part.

## II.    BACKGROUND

This case turns on two competing narratives of Plaintiff's brief, tumultuous tenure as principal of Oriskany High School. According to Plaintiff, she was a capable, hard-working principal dragged down by a sexist superintendent and acquiescent board. Defendants tell a much

---

[1] In the April 2018 MDO, the Court "consider[ed] Defendants' arguments in light of [the Amended Complaint]." Id. at 2.

[2] Citations refer to the page numbers generated by CM/ECF, the Court's case management system. For documents on which CM/ECF has not generated page numbers, the Court cites to that document's internal pagination.

different story, claiming that Plaintiff was in over her head from day one, and only grew more ineffective as the school careened from crisis to crisis under her mismanagement.

Before moving to the specifics, the Court turns briefly to Defendants' Reply to Plaintiff's Responsive SMF, in which Defendants object that Plaintiff's Responsive SMF does not comply with the local rule requiring that "[t]he non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in a short and concise statement, in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." Defs.' Reply to Pl.'s Responsive SMF at 1 (quoting N.D.N.Y. L.R. 7.1(a)(3)). For the most part, Defendants' grievance is well founded. For instance, in response to Defendants' statement that "[o]ne of the incidents in September 2016 that prompted Plaintiff's termination was her abandonment of the 'bell' system used at the high school to announce the beginning and end of class periods," Defs.' SMF ¶ 108, Plaintiff responds: "Admit that the 'bell system' is a pretextual excuse used by Defendants to make their discriminatory termination of Plaintiff's employment," Pl.'s Responsive SMF ¶ 108. The Court disregards Plaintiff's inappropriate insertion of legal arguments in Plaintiff's Responsive SMF, and deems admitted any of Defendants' statements that are not countered with denials and specific citations to the record. See N.D.N.Y. L.R. 7.1(a)(3); Maioriello v. New York State Office for People With Developmental Disabilities, 272 F. Supp. 3d 307, 311 (N.D.N.Y. 2017) ("[T]hroughout Plaintiff's Rule 7.1 Response, she "admits" many of the facts asserted by Defendants in their Rule 7.1 Statement but then includes additional facts and/or legal argument in those responses. Where this occurs, the Court will deem those facts admitted and disregard the additional factual assertions and/or argument that Plaintiff provides in her responses." (citations omitted)).

The rest of this section summarizes the facts as recounted by both parties.

### A.  Plaintiff is Hired

Despite the numerous defendants and third parties named in this litigation, the case centers around the interactions of only two people: Plaintiff and Greg Kelahan. Kelahan was superintendent of schools for the District from 2010 to June 30, 2017. Defs.' SMF ¶ 4; Pl.'s Responsive SMF ¶ 4. Plaintiff was high school principal for the District from December 16, 2014 until her termination on October 19, 2016. Defs.' SMF ¶ 17; Pl.'s Responsive SMF ¶ 17.

According to Defendants, the District had already gone through three "cycles" of candidates before Plaintiff applied; in each of those cycles, Kelahan had recommended an individual be hired, and the Board had rejected his recommendation. Defs.' SMF ¶ 22. Kelahan contacted Plaintiff to invite her to interview in late 2014, and Kelahan recommended she be hired over two other candidates in that cycle, one of whom was male. Defs.' SMF ¶¶ 23–25. The Board then hired Plaintiff for a probationary term of three years before consideration of tenure. Defs.' SMF ¶¶ 26, 30. Plaintiff has no firsthand knowledge of the other candidates that Kelahan interviewed or recommended, but she agrees that the Board hired her on Kelahan's recommendations for a three-year probationary term. Pl.'s Responsive SMF ¶¶ 23–30.[3]

### B.  Problems from the Start

According to Defendants, "[a]lmost immediately it became apparent that Plaintiff lacked the knowledge, experience, or work ethic to perform her duties properly, and her work performance was poor from the outset." Defs.' SMF ¶ 32. However, "[Mr.] Kelahan believed he could teach [Plaintiff] and bring her along." Defs.' SMF ¶ 34. Plaintiff was assigned a

---

[3] In an unusually colloquial statement, Plaintiff adds that "[s]he was hired quickly, like two weeks after she first contacted the district about the position." Pl.'s Add'l SMF ¶ 156.

"leadership mentor" and offered development seminars. Defs.' SMF ¶¶ 36–37. Plaintiff

responds that "her work performance was within standards from the very beginning, even

according to Defendant Kelahan," though she agrees that Margaret Beck, an executive leadership

coach, served as her leadership mentor. Pl.'s Responsive SMF ¶¶ 32, 36.

Defendants claim that Plaintiff's job performance deteriorated further throughout her

tenure, and assert that she was unfocused, uncommunicative, unable to handle pressure, and that

as a result, the school was "in a virtually continuous state of chaos." Defs.' SMF ¶¶ 40–48.

Defendants describe an incident, for instance, in which Plaintiff thought a state test had gone

missing and "panicked, questioning and accusing people throughout the high school" when in

actuality "the test had simply not yet been delivered." Id. ¶ 42.[4] Plaintiff disputes this, Pl.'s SMF

¶ 42, and touts a variety of accomplishments such as creating a school book-store, increasing

passing rates and tutoring opportunities, and building a "15–20 minute advisory period for

students to provide resources for test prep." Dkt. No. 83-2 ("Krause Affirmation") at 10.

More significantly, Plaintiff attributes any lapses in her focus or performance to

Kelahan's harassment and attempts to undermine her. Pl.'s Responsive SMF ¶¶ 40–48.

Specifically, Plaintiff alleges that Kelahan, who worked in a different building, would come by

her office everyday—far more often than he ever did when there was a male principal. Pl.'s

Add'l SMF ¶¶ 158–59. During these visits, Kelahan would treat Plaintiff "disrespectfully and

dismissively." Id. ¶ 162. He "mocked things in [Plaintiff's] office as 'girly' and 'stupid,'" and

---

[4] While Plaintiff denies this occurred, it is unclear whether the incident that she describes in her denial—"discover[ing] a box of expired tests in a storage closet that were at least 3-5 years old and plac[ing] them under a table for shredding and disposal by a disposal company. There was no panic . . ."—is actually the same event as the one to which Defendants refer. See Defs.' Reply to Pl.'s Responsive SMF ¶ 42 (arguing that Plaintiff's "affirmation describes a different incident" and "nowhere states that the matter asserted did not occur, or that the incident she describes is the only one involving tests").

criticized the way Plaintiff raised her daughter, stating, "What kind of a Mother are you?" <u>Id.</u> ¶¶ 161, 165–66. Plaintiff also claims that Kelahan told her "your family is such a distraction. You're not able to do a good job because of your family," and on another occasion stated that "you're not allowed to talk about your daughter, because it's your passive aggressive way of getting me not to fire you." Dkt. No. 83-4 ("Krause 50-h Hearing") at 20–21. Further, Kelahan regularly screamed at Plaintiff, often reducing her to tears. <u>Id.</u> ¶ 167. On one such occasion, after Plaintiff started crying, Kelahan stated, "It's what I hate about working with women, so emotional." <u>Id.</u> ¶ 168. In February 2016, Kelahan became upset at Plaintiff for failing to include a message he requested in the morning announcements, and he "threw papers in [Plaintiff's] face" and said "[t]ake these while I go do your fucking job."

Kelahan denies that he made any of these statements. 83-8 ("Kelahan Deposition") at 185–86.[5] Kelahan also denies that he "threw papers," instead stating that he "tossed a one- or two-page document on the desk Plaintiff was standing behind." Defs.' SMF ¶ 74 (citing Dkt. Nos. 78-9 ("Sojda Affidavit") ¶¶ 16–17; Kelahan Dep. at 129, 131. In Kelahan's deposition, in response to the question on whether "any of [the papers] hit [Plaintiff]," Kelahan replied, "I definitely do not know. Hit, I do not know the answer to that." Kelahan Dep. at 131; <u>see also</u> Sojda Aff. at 16.

Plaintiff also describes another incident that took place around February 2016 involving Kelahan and Robin Appler, a substitute secretary who later joined the Board. <u>See</u> Dkt. No. 83-7 ("Appler Deposition") at 6–7. Plaintiff states that Kelahan was angry that nobody had answered

---

[5] Defendants submitted excerpts of the Kelahan Deposition with their Summary Judgment Motion, <u>see</u> Dkt. No. 78-14, and Plaintiff submitted the entire transcript with her Response. For ease of reference, the Court cites only to the complete transcript submitted by Plaintiff.

his phone call and "screamed at Krause and her secretary." Pl.'s Add'l SMF ¶ 174; Krause Aff. ¶ 22. Although Defendants do not dispute this, it appears that Appler's actual claim is that Kelahan screamed *about* Plaintiff because he was looking for her, but that Plaintiff was not in Kelahan's presence at the time. Appler Dep. at 24, 26. In any event, Appler found Kelahan's behavior—toward Plaintiff and in general—troubling enough that she brought her concerns to the Board the next month. Appler Dep. at 18–26; Pl.'s Add'l SMF ¶ 175. After Appler complained about Kelahan's behavior at the Board meeting, Kelahan stopped his weekly meetings with Plaintiff and "wouldn't permit [Plaintiff] to converse with him more than a few seconds at a time" before he would say "time's up" and walk out of the room. Pl.'s Add'l SMF ¶ 179; Krause Aff. ¶ 23

On February 12, 2016, Kelahan informed Plaintiff that he planned to recommend to the Board that her appointment not be renewed for the next year. Defs.' SMF ¶ 78. In a memorandum to the Board dated that same day, Kelahan wrote:

> I have spoken with Lisa Krause today about my intention to release her at the end of this school year. Unfortunately, as I have seen with her over the course of the year, she has a difficult time taking responsibility. She believes she hasn't been successful because of me, her secretary, the other administrators, the teachers . . . I have thought very carefully about this—these are not easy decisions.

Dkt. No. 78-33 ("February 12 Memorandum"). This was not the first time Kelahan had suggested Plaintiff would lose her job. Toward the end of the 2014–2015 school year, Kelahan told Plaintiff "I am not sure I will have you back next year," and in September 2015, at the beginning of the next school year, he "advised [Plaintiff] that he was going to cut her position." Pl.'s Add'l SMF ¶¶ 170–71.

Defendants state that because Kelahan "ultimately had no control over whether Plaintiff was actually terminated, and it was his job to support Plaintiff," he proposed a principal

improvement plan ("PIP") to Plaintiff, but "Plaintiff refused to sign the PIP or agree to it." Defs.'
SMF ¶¶ 80–81. Plaintiff states that she "never refused to cooperate with the process" and that
Kelahan had indicated that "he would edit what we discussed and get it back to me to sign with a
union representative present. That meeting never happened." Krause Aff. ¶ 24; Pl.'s Responsive
SMF ¶ 81. While the parties quibble about whether Plaintiff "refused" to sign the PIP, see Defs.'
Reply to Pl.'s Responsive SMF ¶ 81; Defs.' Reply at 8–9, the parties agree that a PIP was never
implemented, see Kelahan Dep. at 49–50; SJ Response at 10. In April or May 2016, Kelahan
changed his mind and informed the Board he was not recommending that Plaintiff be terminated.
Defs.' SMF ¶¶ 79, 83; Kelahan Dep. at 79.

### C.  Final Straws

While Plaintiff was already on thin ice, Defendants cite two events as immediately
precipitating Plaintiff's termination: the 504 plan change and the bell system change.

#### 1.  The 504 Plan

This issue centers around a District student named M.D., who had a 504 plan relating to
peanut/tree nut allergies. Defs.' SMF ¶ 88; Pl.'s Responsive SMF ¶ 88. As Defendants explain:

> A 504 plan summarizes accommodations made for students with
> conditions that affect their ability to learn, behavior, or emotional
> status that do not rise to the level of disabilities under the Americans
> with Disabilities Act. It is governed by the provisions of Section 504
> of the Rehabilitation Act of 1973 and associated regulations, as well
> as state law (New York Education Law § 4402) and regulation (8
> NYCRR § 200.3). The law and District policy and procedure require
> that any changes to a student's 504 plan be adopted through a 504
> committee or subcommittee. Such committees or subcommittees, by
> the established procedure at the District, must at a minimum include
> a parent or person in parental relationship to the student, at least one
> regular education teacher, at least one special education teacher, and
> a District representative qualified to provide or supervise special
> education.
>
> In the summer of 2016, the District had a written policy governing
> creation and modification of 504 plans. A school principal may not

> agree with a parent to make or experiment with changes to the
> arrangements in a 504 plan. That would violate the District's policy
> and internal procedures, as well as the above-referenced laws and
> regulations. The rules and requirements regarding modifications to
> 504 plans are not obscure parts of the District's operations, but
> issues that the District grapples with on nearly a daily basis
> throughout the school year, and frequently throughout the summer
> vacation periods.

Defs.' SMF ¶¶ 89–92 (internal citations omitted).

In contravention to this policy, Plaintiff "negotiated directly with M.D.'s parent to make changes to M.D.'s 504 plan," and without "a 504 committee or subcommittee being convened to make or approve the changes." Defs.' SMF ¶¶ 93, 98. Plaintiff later "professed ignorance of the rules regarding modification of 504 plans" and, after this litigation commenced, asked former [Committee on Special Education] Chair Karen Lobdell to "falsely testify that she had told Plaintiff she could make changes to M.D.'s 504 plan by agreement with M.D.'s parent alone." Defs.' SMF ¶¶ 103, 105.

Plaintiff acknowledges that she negotiated directly with M.D.'s parent and made the changes, Pl.'s Responsive SMF ¶¶ 94–98, but she provides a vastly different account of the incident:

> Krause did what she was instructed to do by the district's then
> Special Education Director, Karen Lobdell. Krause was told by
> Lobdell to go ahead and implement the plan prior to convening a
> committee. Krause had a discussion with [Director of Pupil
> Personnel Services Melissa] Lowell in or about August 2016 about
> the process. Krause told Lowell everything that she was instructed
> to do by Lobdell and Lowell stated "sounds great, keep me posted."
> Krause also told Kelahan about everything regarding the plan for
> this student.

Pl.'s Add'l SMF ¶ 183. Plaintiff adds that it "is very common to make minor changes to a student's 504 plan without a more formal CSE meeting as long as the student's parent or guardian consented to the changes." Pl.'s Add'l SMF ¶ 208 (citing Beck Aff. ¶ 11).

2. *The Bell System*

Sometime during the 2016 school year, the bell system that was used to announce the beginning and end of class periods broke. <u>See</u> Defs.' SMF ¶ 109. Defendants state that, after the bell system broke, Plaintiff "made the unilateral decision to not have it fixed and instead eliminate it at the high school" at the start of the 2016 school year. <u>Id.</u> However, Plaintiff did not inform the faculty, administration, Board, or students that the bell system would not be used, and even "issued an e-mail immediately before the start of the school year attaching a schedule for the bells." Defs.' SMF ¶¶ 110–11. The absence of the bell system came as a surprise to everyone involved and many Board members criticized Plaintiff for not discussing her plan with other stakeholders. Defs.' SMF ¶ 114.

Plaintiff also disputes this account, stating that "Kelahan was aware of [Plaintiff's] plan with respect to having no bells because [Plaintiff] specifically advised him about her plan." Pl.'s Add'l SMF ¶ 184. Plaintiff also asserts she announced the bell system change in a memo dated September 12, 2016. Pl.'s Responsive SMF ¶ 110. While Plaintiff admits that she sent an email attaching a schedule for the bells right before the school year started, she disputes that she came under criticism from the Board for the decision to get rid of the bells, and instead asserts that Kelahan failed to inform the Board of his discussion with Plaintiff about the bell system. Pl.'s Responsive SMF ¶ 114. Defendants assert, however, that while the first day of school was September 8, Plaintiff stated herself that the conversation with Kelahan occurred on September 9, and the memo was not sent out until September 12—thus, neither of these actions mitigated the chaos caused by the unexpected lack of bells on the first day of school. Defs.' Reply to Pl.'s Responsive SMF ¶¶ 110, 113–14.

**D. Termination**

On September 19, 2016, Kelahan advised Plaintiff that he was going to recommend to the

Board that she be terminated. Defs.' SMF ¶ 116.[6] That same day, Kelahan made this

recommendation to the Board. Defs.' SMF ¶ 117; Pl.'s Responsive SMF ¶ 117.[7] The Board

voted to terminate Plaintiff that same day, with members Appler, Graziadei, Mayo, Kernan,

Anderson, and Burtch[8] voting in favor of termination, and member Hanna against. Defs.' SMF

¶¶ 118–19; Pl.'s Responsive SMF ¶¶ 118–19.

---

[6] Defendants also state, "The Board asked Superintendent Kelahan for a recommendation
to terminate Plaintiff." Defs.' SMF ¶ 115. Defendants' only citation for this assertion is
Kelahan's deposition, and Kelahan himself seems unsure if this is true. At one point, he testified:

> A: . . . all of these issues led the Board of Education to say enough is enough.
>
> Q: The Board of Education said that?
>
> A: Correct.
>
> Q. They asked you for a recommendation for termination?
>
> A: Correct.

Kelahan Dep. at 239. However, when the conversation circled back to this topic a short time
later, the exchange went as follows:

> Q: When did [the Board] ask you to make the recommendation for termination?
>
> A: There was no directive.
>
> Q: When did they ask you to make a recommendation for termination?
>
> A. There was no directive. There was no inquiry. There was no request.
>
> Q. Two minutes ago you said that they requested you to make a recommendation for
> termination.
>
> A. There was a discussion where it became very clear to me that that's what they were
> seeking.

Id. at 258–59.

[7] The cited statements of material fact state that Kelahan made his recommendation to the
Board on October 19, 2016. However, this appears to be an error, as the documents on which
those statements rely show the date of September 19, 2016. See Dkt. No. 83-1, Ex. 12 ("Kelahan
Letter").

[8] Burtch is deceased and has been dismissed as a defendant. Apr. 2018 MDO at 5–6.

11

Though Appler had brought concerns about Kelahan's treatment of Plaintiff to the Board, Appler—who had herself joined the Board by this time—voted in favor of termination because:

> Plaintiff did not have the respect of the staff, seemed extremely frustrated, was not a good fit for the job in the first place, had failed to come in and take control when hired, and was not capable of handling the situation at the high school because she lacked the experience to handle the turmoil that was going on. [Appler] believed the high school needed someone with a strong personality who was able to "rally the troops," was "a good communicator," and was "extremely organized."

Defs.' SMF ¶ 122 (citing Appler Dep. at 38–40).

In another noteworthy event in September 2016, sometime around when Kelahan informed Plaintiff that he would seek her termination, the teacher's union declared a vote of "no confidence" in Plaintiff. Defs.' SMF ¶ 49. Kelahan testified that he was not involved in this vote and stated that while he thought the vote took place in September 2016, he did not know whether it took place before or after he recommended Plaintiff's termination. Kelahan Dep. at 223–24. Ellie Bawarski, who was a guidance counselor for the District at the time, states that the vote "was a very unusual measure that speaks to the level of frustration and lack of confidence the faculty had in [Plaintiff]" and that she "was privy to the union's decisionmaking in holding the vote and Kelahan had no involvement at all." Dkt. No. 78-11 ("Bawarski Affidavit") at 8–9; see also Sojda Aff. at 24 ("To the best of my knowledge, Kelahan had nothing to do with the vote being held."). While the testimony that Kelahan was not involved in this—other than the testimony of Kelahan himself—is of questionable admissibility, Plaintiff attempts to refute this by stating that "a teacher" told her that Kelahan was involved—testimony that is clearly inadmissible hearsay. See Krause 50-h Hr'g at 47.

Also worth noting, the PIP issue resurfaced at around this time. In a September 28, 2016 letter from Kelahan to Plaintiff's attorney documenting the reasons for his recommendation that the Board terminate Plaintiff's employment, he wrote, "Despite being on a Principal

Improvement Plan, and despite mentoring, you have not demonstrated adequate improvement in your performance." Kelahan Letter at 1. Kelahan does not dispute that this is what he communicated to the Board, and he describes it as an "oversight." Kelahan Dep. 196–97; see Reply at 8 (referencing "Kelahan's mistake in informing the Board that Plaintiff had been on a principal improvement plan, when in fact it was not implemented after she refused to sign it").

On Kelahan's recommendation, the Board hired Julie Thompson, another woman, as Plaintiff's permanent successor. Defs.' SMF ¶¶ 122–123. Plaintiff points out, however, that her immediate, interim replacement was Thomas Meiss, a man. Resp. at 12; Zumbrun Dep. at 47.

### E.  Prior Principals

The parties also dispute whether Kelahan's treatment of Plaintiff differed from his treatment of previous, male principals. In general, Defendants assert that Kelahan treated everyone the same. They acknowledge that, while he may have been "not entirely tactful, that was at least as common with male employees as it was with female employees." Defs.' SMF ¶ 140; see also Sojda Aff. at ¶ 8 (noting that "[o]ther male high school principals prior to [Plaintiff] were sometimes upset over interactions with Kelahan" and that it "did not seem more severe with [Plaintiff] than with the male principals"); Dkt. No. 78-7 ("Lowell Affidavit") ¶¶ 17–19 (stating "it has been my observation that [Kelahan] tries to help women succeed in the workplace" and that she observed him raise his voice when criticizing past male principals).

Plaintiff asserts the contrary. She points to the testimony of Colleen Zumbrun, who worked as a secretary for Oriskany School District for several years and worked for four male principals before Krause arrived. Zumbrun testified that Kelahan's interactions with these four male principals was "[p]rofessional, interactive," never argumentative, and mutually respectful. Dkt. No. 83-6 ("Zumbrun Deposition") at 10–12. In contrast, Zumbrun observed that Kelahan treated Krause disrespectfully. He would often come into her office and slam her door, speak

over her, and yell at her. Id. at 15–17, 53. Zumbrun also stated that people at the school referred to Kelahan as a "tyrant," but she acknowledged that people had called Kelahan this before Krause arrived. Id. at 22. Additionally, Appler provided testimony that could cut both ways. While she observed Kelahan act condescendingly toward Plaintiff and noted he was "more in attack mode with her," she also opined that Kelahan was "short across the board with staff" and "just across the board a pompous idiot." Appler Dep. at 12–14.

### F.  Procedural History

On February 16, 2017, Plaintiff filed a discrimination complaint with the Equal Employment Opportunity Commission ("EEOC"), and her complaint "was cross-filed with the New York State Division of Human Rights ["DHR"] pursuant to a work-share agreement." Am. Compl. ¶ 60. On August 23, 2017, Plaintiff brought this action against Defendants in Oneida County Supreme Court. Dkt. No. 1 ("Removal Notice") ¶ 1. Defendants removed the action to this Court on September 20, 2017. Id. ¶ 16. On October 27, 2017, Plaintiff filed her original complaint, which alleges that Defendants' treatment of her and the termination of her employment violated the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, the antidiscrimination and retaliation provisions of Title VII and the HRL, and state tort law. Dkt. No. 8 ("Complaint") ¶¶ 27–69.

After considering Municipal Defendants' Motion to Dismiss and Individual Defendants' Motion for Judgment on the Pleadings, the Court found that Plaintiff had plausibly alleged the following claims:

- Title VII gender discrimination and hostile work environment claims against the Municipal Defendants;

- New York State Human Rights Law gender discrimination and hostile work environment

claims against the Municipal Defendants and the Individual Defendants;[9] and

- Section 1983 Equal Protection Clause claim for gender discrimination against Kelahan.

Apr. 2018 MDO at 10, 12, 17–18, 20, 24, 37.

In finding that these claims may proceed, the Court acknowledged that Plaintiff had alleged that only Kelahan was motivated by gender. However, the Court found that under the "cat's paw" theory of liability, the Municipal Defendants could also be liable under Title VII because they terminated Plaintiff based on the recommendation of an allegedly biased supervisor. Apr. 2018 MDO at 9 (citing, inter alia, Holcomb v. Iona Coll., 521 F.3d 130, 143 (2d Cir. 2008) (stating that a plaintiff is "entitled to succeed, even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the . . . process")). Similarly, the Court found that the Individual Defendants could be liable under NYSHRL because NYSHRL extends liability to those who did not participate directly in the discriminatory conduct if they had the power to make personnel decisions. Id. at 19 (citing, inter alia, Mills v. Miteq, Inc., No. 06-CV-752, 2007 WL 2908218, at *6 (E.D.N.Y. Sept. 14, 2007) (stating that "[n]umerous courts within the Second Circuit . . . allow a [NYSHRL] claim to proceed against individual defendants who have participated in the alleged discriminatory conduct, *as well as* employers or those with the authority to hire and/or fire" (emphasis added)); see also id. at 16–18 (finding that Plaintiff had stated plausible NYSHRL claims against Municipal Defendants).

---

[9] In Defendants' list of Plaintiff's remaining claims, Defendants state that Plaintiff's remaining NYSHRL claims are against Kelahan and the Board members. See SJ Mem. at 10. However, Plaintiff still has NYSHRL claims pending against Municipal Defendants. See Apr. 2018 MDO at 16–18, 37.

### III.    LEGAL STANDARD

#### A. Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if, considering the record as a whole, a rational juror could find in favor of the non-moving party. Ricci v. DeStefano, 557 U.S. 557, 586 (2009).

In assessing a motion for summary judgment, a court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in its favor." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (citation omitted). "It is well established that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'" Curry v. City of Syracuse, 316 F.3d 324, 333 (2d Cir. 2003) (citation omitted).

### IV.    DISCUSSION

#### A.  Motions to Strike

The court first addresses Defendants' Motions to Strike.

Defendants' First Motion to Strike requests that the court strike the affirmations of Plaintiff and Margaret Beck, which Plaintiff submitted with her Response. Mot. to Strike at 1; See Dkt. Nos. 82-2 ("Krause Affirmation"); 82-3 ("Beck Affirmation"). Defendants argue:

> Plaintiff has submitted purported affirmations of hers and Margaret Beck, a nonparty witness, without actual signatures, only their names typed on the signature lines.  The purported affirmations should be struck and given no consideration on this motion because, being no more than typed pieces of paper, they cannot satisfy the requirement of Rule 56(c)(4) of the Federal Rules of Civil Procedure that affidavits or declarations be "made on personal knowledge, set

> out facts that would be admissible in evidence, and show that the
> affiant or declarant is competent to testify on the matters stated."

First Mot. to Strike at 1. Defendants also acknowledge this District's General Order #22,

however, which states that "[i]f an original document requires the signature of a non-

attorney . . . the Filing User may convert the document into.pdf text format and submit the

document using 's/' for the signature of the non-attorney." N.D.N.Y. General Order #22, 6.2.

Defendants' request is perplexing. They do not appear to question the authenticity of the

affirmations. And they acknowledge that Plaintiff followed the specific instructions of General

Order #22. Mot. to Strike at 1–2. If, for whatever reason, Defendants needed copies with original

signatures, the logical first step would have been to ask Plaintiff for them. Instead, as Plaintiff

notes, Defendants "chose to needlessly burden the court with a motion to strike." Resp. to Mot.

to Strike at 1. In any event, because Plaintiff has now filed affirmations with the original

signatures of Plaintiff and Margaret, see Dkt. Nos. 96-1, 96-2, the issue is moot. Defendants'

Motion to Strike the affirmations of Plaintiff and Beck is denied.[10]

Defendants' First Motion to Strike also requests that the court strike several exhibits

submitted by Plaintiff because they were not properly sworn or authenticated. First Mot. to Strike

at 2. Defendants first ask the Court to strike Plaintiff's Exhibit 2, the prepared remarks of

---

[10] Although Defendants do not quite say it outright, their argument seems to be that General Order #22's acceptance of typed signatures contravenes Fed. R. Civ. P. 56's purported requirement that affidavits include the affiant's original signature. See Mot. to Strike at 2. While the cases Defendants cite from other courts in this Circuit do not directly address this issue, the Court does note that some courts in other jurisdictions have found such a requirement in Fed. R. Civ. P. 56. See Brumfield v. VGB, Inc., No. 17-CV-2223, 2018 WL 354294, at *2 (E.D. La. Jan. 10, 2018) ("The signature must be handwritten; typed notations on the signature line of '/s/' and the affiant's typed name are insufficient."). But even if the Court were to address this issue and agree with Defendants, the Court would not be so unjust as to strike (and not allow for resubmission of) Plaintiff's affidavits, given Plaintiff's compliance with an order from the Northern District itself.

Colleen Zumbrun. Mot. to Strike at 2; see Dkt. 83-1, Ex. 2 ("Zumbrun Remarks"). In response to

this request, Plaintiff explains that "Zumbrun's prepared remarks were transmitted to [Plaintiff]

by e-mail on March 27, 2019," and that Plaintiff included an affidavit to that effect. Resp. to

Mot. to Strike at 2; Dkt. No. 96-3. But this raises a separate issue, Defendants assert, because if

Plaintiff had this document in March 2019, she should have turned it over pursuant to

Defendants' request for "any statements pertaining to Plaintiff's claims or Defendants' defenses

in this litigation." Second Mot. to Strike at 2; see also Fed. R. Civ. P. 26(e)(1)(A) (requiring a

party who has responded to a request for production to "supplement or correct its disclosure or

response: (A) in a timely manner if the party learns that in some material respect the disclosure

or response is incomplete or incorrect, and if the additional or corrective information has not

otherwise been made known to the other parties during the discovery process or in writing").

Plaintiff has made no attempt to refute Defendants' assertions, and it is not apparent to the Court

that Plaintiff's failure to produce this document was justified or harmless.[11] Therefore, the Court

finds that Plaintiff may not rely on the Zumbrun Remarks. Fed. R. Civ. P. 37(c)(1) ("If a party

fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use

that information . . . on a motion, at a hearing, or at a trial, unless the failure was substantially

justified or is harmless.").

      Defendants also object that Exhibits 6, 7, 10, 14, and 15 to Plaintiff's Response are not

properly authenticated. First Mot. to Strike at 2. Because none of these documents have any

---

[11] "Substantial justification means justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request . . . . Harmlessness means an absence of prejudice." Engler v. MTD Prod., Inc., 304 F.R.D. 349, 355 (N.D.N.Y. 2015) (internal quotation marks and citations omitted).

bearing on the Court's analysis, however, the Court does not address whether they are properly authenticated at this time.

In Plaintiff's response to the Motion to Strike, Plaintiff also included an affirmation by Michelle Simiele, "a 19 year employee as a School Counselor of the Watkins Glen School District." Dkt. No. 96-4 ("Simiele Affirmation.") ¶ 1. In the affirmation, Simiele includes a variety of allegations regarding Kelahan, who began working as superintendent of the school district in 2017. Defendants object vociferously:

> The affirmation of Ms. Simiele is utterly irrelevant and has no probative value in the context of Defendants' motion. It is entirely concerned with alleged events and conduct that did not involve Plaintiff, supposedly occurring not only well after the termination of Plaintiff but at an entirely different (and geographically far removed) school district. These alleged instances, even if they had any connection to the truth (which Defendants do not concede), would be so far outside the bounds of relevance as not even to be discoverable.

Second Mot. to Strike. at 1. The Court agrees.

Plaintiff claims that because "[t]he conduct and actions of Mr. Kelahan as described by Ms. Simiele are profoundly consistent with [Plaintiff's] experiences and allegations[,] [t]hey are relevant to show discriminatory motivation and pretext." Resp. to Mot. to Strike at 2. But the cases on which Plaintiff relies involve courts assessing allegations made by another employee at the same company as the plaintiff. See Zubulake v. UBS Warburg LLC., 382 F. Supp. 2d 536, 544 (S.D.N.Y. 2005) (finding that a plaintiff could introduce evidence that her manager also discriminated against another of the defendant company's employees); Scott v. WPIX, Inc., No. 10-CV-4622, 2012 WL 2026428, at *2 (S.D.N.Y. May 17, 2012) (finding that the testimony of plaintiff's coworkers about discrimination they faced could be relevant). Here, because the events in question occurred after the fact and in a different school district, Plaintiff may not rely

on this affirmation. See Fox v. Nat'l R.R. Passenger Corp. (Amtrak), No. 06-CV-1135, 2009 WL 425806, at *6 (N.D.N.Y. Feb. 19, 2009) (Kahn, J.) (noting that a plaintiff must "show how the comments contributed to *his own* working environment being hostile") (emphasis added), aff'd sub nom. Fox v. Nat'l R.R. Passenger Corp., 370 F. App'x 156 (2d Cir. 2010).

In sum, the Court grants Defendants' Motions to Strike the Zumbrun Remarks (Dkt. No. 83-1, Ex. 2) and the Simiele Affirmation (Dkt. No. 96-4). Defendants' Motions to Strike are otherwise denied.

### B. Summary Judgment

As stated above, the Court also found that the following claims survived Defendants' dismissal motions:

- Title VII gender discrimination and hostile work environment claims against Municipal Defendants;

- NYSHRL gender discrimination and hostile work environment claims against Municipal Defendants and Individual Defendants; and

- Section 1983 Equal Protection Clause claim for gender discrimination against Kelahan.

Apr. 2018 MDO at 10, 12, 16–18, 20, 24, 37. Defendants move for summary judgment on all remaining claims, raising two broad arguments. See generally SJ Mem. First, Defendants argue that all of Plaintiff's gender discrimination claims—under Title VII, NYSHRL, and § 1983—fail because Plaintiff cannot satisfy those provisions' burden shifting analysis. Id. at 11–19. Second, Defendants argue that all of Plaintiffs hostile work environment claims—under Title VII and NYSHRL—fail because those claims were not brought within the statute of limitations, and because there is no evidence that Kelahan treated men and women any differently. Id. at 19–26.

### 1.  Gender Discrimination (Title VII, NYSHRL, and § 1983)

"Title VII makes it unlawful for an employer to discriminate against any individual based on that person's sex." Walsh v. New York City Hous. Auth., 828 F.3d 70, 74 (2d Cir. 2016) (citing 42 U.S.C. § 2000e-2(a)(1)). Sex discrimination claims under Title VII are "analyzed using the familiar burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 [] (1973)." Id. at 74–75. Sex discrimination claims brought under NYSHRL and § 1983 are also analyzed under this framework. See Pucino v. Verizon Wireless Commc'ns, Inc., 618 F.3d 112, 117 (2d Cir. 2010) ("We review discrimination claims brought under the NYSHRL according to the same standards that we apply to Title VII discrimination claims."); Raspardo v. Carlone, 770 F.3d 97, 125 (2d Cir. 2014) ("[A] § 1983 claim for sex discrimination is analyzed under the burden-shifting framework of McDonnell Douglas Corp. v. Green . . . utilized in Title VII claims.").[12]

The Second Circuit has described this framework as follows:

> First, plaintiff must establish a *prima facie* case of sex discrimination by demonstrating that "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." Liebowitz v. Cornell Univ., 584 F.3d 487, 498 (2d Cir. 2009). "The burden of establishing a prima facie case is not onerous, and has been frequently described as minimal." Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998) (internal quotation marks omitted). If the plaintiff successfully establishes a *prima facie* case, "the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action." United States v. Brennan, 650 F.3d 65, 93 (2d. Cir. 2011) (internal quotation marks omitted). If the employer carries that burden, "the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of

---

[12] However, as discussed below, the application of step three of this framework differs for § 1983 claims.

fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination."

Walsh, 828 F.3d at 75. The Court considers each step of this framework in turn.

a.  Prima Facie Case[13]

As noted above, to establish a prima facie case of sex discrimination, a plaintiff must allege "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." Leibowitz v. Cornell Univ., 584 F.3d 487, 498 (2d Cir. 2009) superseded on other grounds by statute.

---

[13] As this Court has previously stated:

> "[T]he question of whether the plaintiff has met h[er] prima facie burden of demonstrating an inference of discrimination is often indistinguishable from the question of whether the employer's actions served merely as a pretext for some disguised discriminatory animus towards the plaintiff." Jimenez v. Donahoe, No. 10-CV-3289, 968 F. Supp. 2d 609, 618 [] (S.D.N.Y. Sept. 11, 2013). Thus, "[d]espite the elaborate process set up in McDonnell Douglas, Second Circuit case law makes clear that a court may simply assume that a plaintiff has established a prima facie case and skip to the final step in the McDonnell Douglas analysis." Idrees v. City of New York, No. 04-CV-2197, 2009 WL 142107, at *9 (S.D.N.Y. Jan. 21, 2009) (citing cases). This is because a plaintiff who can prevail at the third stage of the McDonnell Douglas process has necessarily demonstrated circumstances giving rise to an inference of discrimination, and a plaintiff who cannot prevail at the third stage cannot prevail on her claim whether or not there exist circumstances giving rise to an inference of discrimination.

Bader v. Special Metals Corp., 985 F. Supp. 2d 291, 312–13 (N.D.N.Y. 2013) (Kahn, J.). This has led some courts, including this Court at times, to consider the first and third steps of McDonnell Douglas in unison. In this instance, however, the Court finds it analytically useful to consider the steps in their traditional order because much of Kelahan's alleged mistreatment of Plaintiff occurred well before the workplace incidents that Defendants say justified Plaintiff's termination.

22

The first three elements of Plaintiff's prima facie case are not in dispute. First, Plaintiff, as a female, is a member of a protected class. See Resp. at 9; see also 42 U.S.C. § 2000e-2. Second, Defendants do not argue—at least in the context of the prima facie analysis—that Plaintiff was not qualified for her position. Resp. at 9; see generally SJ Mem. Third, Defendants do not dispute that Plaintiff's termination constitutes an adverse employment action. See Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) ("Examples of materially adverse changes include termination of employment . . . .") (quotation marks omitted).

Defendants do argue, however, that there is no genuine issue of material fact as to Plaintiff's failure to satisfy the fourth prong: "the adverse action occurred under circumstances giving rise to an inference of discrimination." Leibowitz, 584 F.3d at 498. "It is well-settled that an inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to: 'the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'" Id. (quoting Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 37 (2d Cir. 1994)). "The burden of proof that must be met to permit an employment-discrimination plaintiff to survive a summary judgment motion at the prima facie stage is *de minim[i]s.*" Chambers, 43 F.3d at 37 (internal quotation marks omitted). "Since the court, in deciding a motion for summary judgment, is not to resolve issues of fact, its determination of whether the circumstances 'giv[e] rise to an inference' of discrimination must be a determination of whether the proffered admissible evidence shows circumstances that would be sufficient to permit a rational finder of fact to infer a discriminatory

motive. It is not the province of the summary judgment court itself to decide what inferences should be drawn." Id. at 38.

Plaintiff's assertions of discrimination against Kelahan break down into two general categories: (1) Kelahan's disparaging, gender-based comments; and (2) Kelahan's favorable treatment of Plaintiff's male predecessors and coworkers. Defendants raise several objections to each of these assertions, and also argue that the Kelahan lacked discriminatory intent under the "same actor" doctrine.  The Court considers each of these arguments in turn.[14]

### i. Invidious Comments

In support of finding an inference of discrimination, Plaintiff primarily argues that Kelahan made disparaging comments to Plaintiff regarding her gender. Resp. at 9.

Plaintiff testified that Kelahan would "often make fun of me for the way that I raised my daughter," and would make comments like "what kind of a mother are you?" Krause 50-h Hr'g at 17. Plaintiff also claims that Kelahan told her "your family is such a distraction. You're not able to do a good job because of your family," and on another occasion stated that "you're not allowed to talk about your daughter, because it's your passive aggressive way of getting me not to fire you." Krause 50-h Hr'g at 20–21. In Spring 2015, after Kelahan had reduced Plaintiff to tears in a conversation about which Plaintiff does not recall the details, Kelahan stated that he hated working with women because they were too emotional. Krause 50-h Hr'g at 94; Dkt. No. 83-5 ("Krause Deposition") at 91.[15] Plaintiff added that Kelahan reduced her to tears over

---

[14] As noted above, Plaintiff's claims of directly discriminatory conduct are limited to Kelahan; the claims against the other Defendants' are premised on a "cat's paw" theory of liability. Thus, this section focuses on Kelahan's allegedly discriminatory actions.

[15] Plaintiff alleges that Kelahan also told her on a separate occasion that she was "too emotional." Resp. at 9 (citing Krause 50-h Hr'g at 39). However, it appears likely that all of Plaintiff's testimony about the "too emotional" comments refers to a single incident. In her 50-h

twenty-five times, though she did not specify that Kelahan made gendered remarks during these other interactions. Krause Dep. at 82–83. Plaintiff also testified that Kelahan criticized the decorations in her office, and at one point, shortly after Krause began her job, called them "girly." Krause Dep. at 85. Krause could not recall other, later instances in which Kelahan used similar terms to criticize her office. Id.

Defendants argues Kelahan's gendered remarks are simply "stray remarks" unconnected to Plaintiff's termination. SJ Mem. at 9. The Second Circuit has outlined four factors that a court should consider in determining whether remarks are indicative of discriminatory intent or simply "stray:"

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process) . . . [N]one of these factors should be regarded as dispositive . . . .

Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 149–50 (2d Cir. 2010)

Here, although the four factors do not uniformly point in either direction, an overall analysis suggests that a reasonable jury could find that the remarks are not stray but rather give rise to an inference of discrimination.

The first factor supports an inference of discriminatory intent: Kelahan was Krause's boss and recommended that she be terminated. Defs.' SMF ¶ 117; Pl.'s Responsive SMF ¶ 117.[16] The

---

Hearing, she described that this allegedly separate incident also occurred in a Spring 2015 conversation with Kelahan in which she had been "reduce[d] to tears," Krause 50-h Hr'g at 39, just as she later described the above incident, id. at 94. Further, in her deposition, in response to the question whether "Kelahan at some point t[old] you [that] you were too emotional," Krause answered that "[o]ther than the comment about that's why I hate working with women, no, I don't ever remember him saying that." Krause Dep. at 92.

[16] Due to the uninformative nature of some of the exchanges between Plaintiff's counsel

second factor is a closer call, as Plaintiff admits that Kelahan's most explicitly gendered comments occurred early in her tenure. On the other hand, however, Plaintiff's entire employment only lasted eighteen months. As to the third factor, a jury could reasonably conclude that the content of at least some of Kelahan's remarks was discriminatory—it would certainly not be unreasonable for a jury to find that remarks such as "this is why I hate working with woman [sic], so emotional" and "what kind of a mother are you?" Krause 50-h Hr'g at 17, 94, were discriminatory. The fourth factor—the context in which the remark was made, and in particular if it was related to the decision-making process—also favors Plaintiff. While the remarks were not made in the context of a conversation that led directly to Plaintiff's termination, drawing all inferences in Plaintiff's favor, Kelahan made multiple derogatory remarks about Plaintiff's gender that were directly tied to her employment prospects. The comment about hating working with women because they are too emotional—while Plaintiff was showing emotion, no less— obviously falls in this category. So do the comments "your family is such a distraction. You're not able to do a good job because of your family," and "you're not allowed to talk about your daughter, because it's your passive aggressive way of getting me not to fire you."

Considering all the above, a reasonable jury could find Kelahan's remarks evince discriminatory intent. In Rose v. New York City Bd. Of Educ., for instance, the Second Circuit found that similar remarks—also made by a superintendent to a principal—showed discriminatory intent. 257 F.3d 156, 162 (2d Cir. 2001) In that case, the superintendent told the principal that, if she could not follow his instructions, he would replace her with someone

---

and Kelahan during his deposition, it remains unclear whether the Board has the authority to terminate a principal without the superintendent's recommendation. See Kelahan Dep. at 258 ("Q: The Board will not terminate a principal in the absence of a recommendation by the superintendent, correct? A: That is not true. They can't, but they will attempt").

"younger and cheaper." <u>Id.</u> at 158. The Court found that this (and a second "younger and cheaper" remark made by the superintendent during an argument) "were direct evidence of discriminatory animus." <u>Id.</u> at 162. The court explained that, similar to Kelahan's remarks to Plaintiff, these "were not the stray remarks of a colleague but rather were comments made directly to her on more than one occasion by her immediate supervisor, who had enormous influence in the decision-making process." <u>Id.</u>

By contrast, the cases that Defendants rely upon involved clearly stray remarks. In <u>Johnson v. Cty. of Nassau</u>, for instance, a court found that a single remark made two years before the plaintiff was transferred was stray when the plaintiff provided no explanation of how the remark "can logically be tied to any of the alleged adverse actions and no connection is apparent from the Court's review of the record." 480 F. Supp. 2d 581, 600 (E.D.N.Y. 2007). Likewise, in <u>Colon v. Fashion Inst. of Tech. (State Univ. of New York)</u>, a court found there was no discriminatory intent when the one remark was made three years before the employment action in question, and plaintiff advanced no other allegations occurring within the intervening three years. 983 F. Supp. 2d 277, 289 (S.D.N.Y. 2013). Here, in contrast, Plaintiff alleges that Kelahan continued to harass her up until her termination. <u>See, e.g.</u>, Krause 50-h Hr'g at 17 (noting that comments like "what kind of mother are you?" "happened multiple times in [her] year and a half of employment").

Defendants take issue with Plaintiff's reliance on the "bad parent" comments, arguing that these remarks "carry no indicia of bias against females." SJ Mem. at 15. This argument is unconvincing. First, despite Defendants' dedication to referring to these as "comments implying Plaintiff was a 'bad parent,'" <u>id.</u>, Plaintiff specifically testified that Kelahan asked, "What kind of mother are you?" Krause 50-h Hr'g at 17. The Court acknowledges, however, that in

Plaintiff's deposition, she described Kelahan's conduct as follows: "[I]f I was talking about my daughter, he would say something like I can't believe you let her do that, what kind of a parent are you or things of that nature." Krause Dep. at 86–87. Therefore, it is not entirely clear whether Plaintiff meant "what kind of mother are you?" to represent literally what Kelahan said, or instead the gist of Kelahan's statements. But even if it was proven that Kelahan called her exclusively a bad parent, a jury could certainly infer discriminatory intent from that remark. For, remarks do not need to be overt to suggest discriminatory intent—especially where, as here, there are also allegations of explicitly sexist comments. See Mason v. Se. Pennsylvania Transportation Auth., 134 F. Supp. 3d 868, 871, 875–76 (E.D. Pa. 2015) (denying summary judgment in Title VII case alleging racial discrimination when "[w]ith one exception, these comments were not overtly racist, but could be considered to embody cultural stereotypes derogatory towards African Americans" and explaining that the "frequent questions to [plaintiff] about whether he was 'staying out of trouble,' and . . . about his criminal record may not, by themselves, demonstrate racial animus. However, the use of the racial epithet could lead a jury to view these other incidents in a different light . . . ."); Danzer v. Norden Sys., Inc., 151 F.3d 50, 56 (2d Cir. 1998) (explaining that when "other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance.").

### ii.  Disparate Treatment

Plaintiff also claims that Kelahan treated Plaintiff differently than her male predecessors and coworkers. Resp. at 10. Defendants, however, are correct that Plaintiff's disparate treatment claim must fail because she has failed to "identify[] a similarly-situated male principal who received more favorable treatment." SJ Mem. at 8. "In order for employees to be similarly

situated for purposes of establishing a plaintiff's prima facie case, they must have been subject to the same standards governing performance evaluation and discipline, and must have engaged in conduct similar to the plaintiff's." Norville v. Staten Island University Hospital, 196 F.3d 89, 96 (2d Cir. 1999) (internal quotation marks omitted). Plaintiff has not proffered evidence to satisfy any of these requirements for establishing a prima facie case. Therefore her disparate treatment claim is unavailing.

That said, the Court notes that the two key issues that lead to termination—the 504 plan and the elimination of the bell system—both occurred well after Plaintiff claims that Kelahan began treating her differently than her male predecessors. See e.g., Defs.' SMF ¶ 94; Pl.'s Responsive SMF ¶ 94. And Plaintiff has provided some evidence suggesting Kelahan treated Plaintiff differently from her male predecessors. According to Zumbrun, who worked as a secretary for Plaintiff as well as several of her male predecessors, Kelahan's interactions with those four male principals were "[p]rofessional, interactive," never argumentative, and mutually respectful. Zumbrun Dep. at 10–12. In contrast, Zumbrun observed that Kelahan treated Krause disrespectfully and that he would often come into her office, slam her door, speak over her, and yell at her. Id. at 15–17, 53. Further, she noted that Kelahan came to school more frequently when Plaintiff worked there. Id. at 13. Appler, who also worked as a substitute secretary at the time, observed that Kelahan could be condescending toward Plaintiff and was "more in attack mode with her" than he was with other employees. Appler Dep. at 12–14. In the context of the more developed evidence regarding Kelahan's invidious comments—which alone is sufficient to establish a prima facie case—if a reasonable jury believed that Kelahan subjected Plaintiff to unprecedented surveillance and criticism, it could find that that evidence bolsters Plaintiff's claim.

### iii.  Same Actor Inference

Defendants also argue that Kelahan's actions do not create an inference of discrimination because of the "same actor inference." SJ Mem. at 8. The Court disagrees.

"When the same actor hires a person already within the protected class, and then later fires that same person, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 137 (2d Cir. 2000) (internal quotation marks omitted). "[D]istrict courts within the Circuit explicitly recognize that the same actor inference applies with greatest force where the act of hiring and firing are not significantly separated in time." Jackson v. Post Univ., Inc., 836 F. Supp. 2d 65, 89 (D. Conn. 2011) (internal quotation marks omitted). "This 'same actor' finding does not, however, end the question . . . [and] should not be used as a substitute for a thorough factual inquiry." Id. at 92.

The parties agree that Kelahan invited Plaintiff to interview for the position, and that the Board hired her on Kelahan's recommendation. Defs.' SMF ¶¶ 23–26, 30; Pl.'s Responsive SMF ¶¶ 23, 26. But Plaintiff claims that Kelahan had a "collateral incentive" to hire Plaintiff, Resp. at 14, which, as the Second Circuit has explained, would mean that the "same-actor rationale has far less applicability in these circumstances." See Jetter v. Knothe Corp., 324 F.3d 73, 76 (2d Cir. 2003) ("This rationale has usually been applied in circumstances where the person making the hiring decision had no collateral incentive to hire any particular candidate. Here, in contrast, Defendants wanted to acquire Plaintiff's company, and in order to succeed in that desire, they were forced to hire Plaintiff.") !

Specifically, Plaintiff argues that by the time she interviewed, Kelahan's deadline to hire a new principal had long passed, and thus he felt pressured to settle for a candidate he may not

have actually wanted. Id. As evidence Plaintiff for this, Plaintiff cites an exhibit that Defendants

object to as improperly authenticated. See First Mot. to Strike at 2 (arguing that, inter alia, Dkt.

No. 83-1, Ex. 14 is not properly authenticated because there is no explanation of "the nature or

origin of the file"). But even if the Court were to accept Defendants' arguments and strike this

exhibit, there is other evidence in the record that could lead a reasonable jury to the same

conclusion. Defendants themselves state that Kelahan had already recommended three other

candidates for the principal position, each of whom the Board had rejected. Defs.' SMF ¶ 22.

And Lowell's statements about the interview process also suggest time was a factor, as she noted

her concern that Plaintiff "was unable to fully answer some questions we posed," but "the other

candidates considered alongside [Plaintiff] were not more promising." Lowell Aff. ¶ 23.

        The time pressures that Plaintiff describes are not as strong of an antidote to the same

actor rationale as the incentive to acquire a company cited above. See Jetter, 324 F.3d at 76. But

even with the same actor inference in Kelahan's favor, it is not enough to overcome the evidence

of his discriminatory intent. In Jackson v. Post Univ., Inc., for instance, the Court acknowledged

that the same actor inference was relevant, but granted summary judgment to defendant primarily

because it determined the allegedly discriminatory statement was no more than a "stray remark."

836 F. Supp. at 95. Here, as discussed, the remarks are evidence of discriminatory intent, and

Kelahan's involvement in Plaintiff's hiring does not erase that.[17] See Copeland v. Rosen, 38 F.

_____

        [17] Defendants also argue against an inference of discrimination because Plaintiff was
replaced by a woman, Julie Thompson. SJ Mem. at 13. Plaintiff counters that her "immediate"
replacement was a man, Thomas Meiss, who was appointed interim principal after Plaintiff's
termination. Resp. at 12 (citing Zumbrun Dep. at 47). Further, Plaintiff argues that she had
already filed a notice of claim by the time the District hired Thompson, suggesting that the
"decision to hire another female principal was made with the specter of a gender discrimination
lawsuit looming overhead . . . ." Id. at 13.

Supp. 2d 298, 305 (S.D.N.Y. 1999) ("The 'same actor' inference is not a necessary inference, it is only a plausible one, and decisions in this Circuit addressing it have warned that its use is not to become a substitute for a fact-intensive inquiry into the particular circumstances of the case at hand.").

In sum, the Court finds that Kelahan's derogatory, gendered remarks could lead a reasonable jury to believe that the circumstances of Plaintiff's termination give rise to an inference of discrimination, and thus, that Plaintiff has met her prima facie burden. See Weiping Liu v. Indium Corp. of Am., No. 16-CV-1080, 2019 WL 3825511, at *17 (N.D.N.Y. Aug. 15, 2019) ("Though many of Plaintiff's factual assertions fail to provide a basis for inferring racial discrimination and Indium's hiring of an Asian scientist to replace him weighs against such an inference, viewing the facts in the light most favorable to Plaintiff, the Court concludes that Defendants' alleged disparate treatment of Plaintiff's complaint of harassment, which was connected to the series of events that led to his termination, and Lee's remark that '[s]ome Chinese had been let go' are sufficient to satisfy Plaintiff's minimal burden of showing that his termination occurred under circumstances giving rise to an inference of racial discrimination.").

### b.  Legitimate, Non-discriminatory Reason

Once the plaintiff has presented a prima facie case of discrimination, the defendant has the burden of producing, "reasons for its actions which, *if believed by the trier of fact,* would support a finding that unlawful discrimination was not the cause of the employment action." Chambers v. TRM Copy Centers Corp., 43 F.3d 29, 38 (2d Cir. 1994) (emphasis in original). "The employer need not *persuade* the court that it was motivated by the reason it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior." Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998) (emphasis in original). !!

Defendants assert that Plaintiff was terminated for "her persistent work performance issues, culminating especially in the 504 plan changes and bell system issue." SJ Mem. at 16. The burden therefore shifts back to Plaintiff to show that Defendants' proffered reasons were merely a pretext for discrimination. See Bader v. Special Metals Corp., 985 F. Supp. 2d 291, 313 (N.D.N.Y. 2013) ("Defendants have proffered the same non-discriminatory reason for each of the adverse actions at issue: Plaintiff was disciplined for performance and conduct issues. The burden therefore shifts to Plaintiff to demonstrate that these reasons were pretext for discrimination.").

                                                                    c.  Pretext

Plaintiff argues that Defendants' proffered reasons for Plaintiff's termination—the 504 plan and bell system changes—were far less serious than Defendants make them out to be, and that Defendants only fixated on the issues when they "sought to justify terminating Plaintiff." Resp. at 16.

As the Second Circuit recently explained, at step three, Plaintiff's faces a heightened burden for her § 1983 claims:

> [A]t the third step of the McDonnell Douglas analysis, a plaintiff asserting a § 1983 claim bears a higher burden in establishing that the employer's alternative, nondiscriminatory reason for the adverse employment action is "pretextual." To establish "pretext" under Title VII, a plaintiff need only establish that discrimination played a role in an adverse employment decision. In other words, a Title VII plaintiff need only prove that the employer's stated non-discriminatory reason was *not the exclusive* reason for the adverse employment action. By contrast, to establish "pretext" under § 1983, a plaintiff must establish that the employer's stated reason would not, alone, constitute a *sufficient* basis for pursuing an adverse action. In other words, a § 1983 plaintiff must establish that the employer's stated non-discriminatory reason is either false or inadequate to support the adverse employment action.

Naumovski v. Norris, 934 F.3d, 214–15 (2d Cir. 2019) (emphasis in original) (internal quotation marks omitted). "Claims brought under the NYSHRL are analyzed identically [to Title VII] and the outcome of an employment discrimination claim made pursuant to the NYSHRL is the same as it is under . . . Title VII." Hyek v. Field Support Servs., Inc., 461 F. App'x 59, 60 (2d Cir. 2012); see also Betterson v. HSBC Bank, USA, N.A., 139 F. Supp. 3d 572, 585 (W.D.N.Y. 2015), aff'd, 661 F. App'x 87 (2d Cir. 2016) ("The standards for evaluating employment discrimination claims under Title VII and the NYSHRL are identical.").

Here, Defendants suggest multiple non-discriminatory reasons for Plaintiff's termination, which can be sorted into three general buckets: the 504 plan, the bell system, and general performance issues. The Court addresses the factual disputes about each—that is, what happened, and how serious it was. Second, the Court asks whether all the incidents, considered together, provided Defendants a "sufficient" or "exclusive" reason to terminate Plaintiff. The Court finds that while these reasons provide a sufficient justification for Plaintiff's termination, and thus defeat Plaintiff's § 1983 claim, a reasonable jury could find that these reasons were not the exclusive justification. Thus, Plaintiff's gender discrimination claims under Title VII and NYSHRL survive summary judgment.

*i. The Reasons for Termination*

1.  504 Plan

Defendants devote the bulk of their briefing on this issue to the 504 plan changes. Their stance, as outlined in the fact section, is that law and district policy required that any changes to a 504 plan be made by a committee. Defs.' SMF ¶¶ 89–92. Plaintiff flagrantly disregarded this by "negotiate[ing] directly" with a student's parent to make changes to his 504 plan regarding his

peanut/tree allergy without "a 504 committee or subcommittee being convened to make or approve the changes." Defs.' SMF ¶¶ 93, 98.

Although Plaintiff also objects to Defendants' characterization of the District's policy and practice on 504 plan changes, her primary counterargument is that regardless of the official District policy, the special education director, the replacement for the special education director, and Kelahan were on board with the way she handled the situation. Resp. at 11–12. Therefore, to the extent Kelahan cites Plaintiff's violation of the 504 Policy as a reason for Plaintiff's termination, it is merely pretext for his underlying animus. Id.

Assessing these arguments requires a closer look at the facts. Plaintiff asserts that the first special education director, Karen Lobdell, told her to take the direct negotiation route, and instructed her "to do a test run to see how things worked for the first two weeks of school and then . . . reconvene a 504 meeting and formally make those changes if everything worked and everyone was in agreement." Krause 50-h Hr'g at 53; see also Krause Aff. ¶ 24. Lobdell retired on July 1, 2016, and in August 2016 Plaintiff informed the new special education director, Melissa Lowell, what Lobdell had instructed Plaintiff to do, to which Lowell replied, "Sounds good. Keep me posted." Id.; see also Krause Aff. ¶ 30. Plaintiff claims that she "also told Kelahan about everything regarding the plan for this student." Pl.'s Add'l SMF ¶ 183; see also Krause Aff. ¶ 31 ("Defendant Kelahan made [an] inquiry of me regarding this student approximately two weeks later. I updated him, as I had done with Lowell. He also did not indicate anything was wrong with what was done or planned.").

Defendants dispute essentially all of this. First, Defendants argue, and the Court agrees, that Plaintiff "seeks through deliberately ambiguous language in her affirmation to create the impression that Defendant Kelahan was notified of the 504 plan changes . . . before they went

into effect." Reply at 3. Despite Plaintiff's assertions that she kept Kelahan updated on the situation, her own deposition testimony indicates that she did not inform Kelahan of the 504 plan changes until he confronted her about the issue *after* the school year began. See Krause Dep. at 167 (stating that Kelahan approached her about the issue "three or four days before he asked for my resignation . . . on September 13"); Dkt. No. 90-1, Ex. HH ("School Calendar") (listing first day of school for students as September 8, 2016). Thus, there is no genuine issue of fact concerning Plaintiff's failure to apprise Kelahan of the 504 plan changes before the school year began.[18]

Defendants also dispute that Lowell and Lobdell gave the recommendations or approval that Plaintiff claims they did. Lobdell describes Plaintiff's claim that Lobdell "directed or approved that she develop changes to the 504 Plan . . . by working the changes out privately with the student's parent . . . ." as "absolutely false." Dkt. No. 78-8 ("Lobdell Affidavit") ¶ 6. Likewise, Lowell states she was "surprised and concerned" when she first found out that Plaintiff had worked out changes directly with the parent and thought it was "extremely poor judgment in this context to fail to follow established procedure." Lowell Aff. ¶ 10. Hence, there is an issue of fact as to whether Plaintiff's statements regarding Lowell and Lobdell are true.

However, these disputed facts are not material. Lobdell and Lowell both state that they informed Kelahan of their side of the story before Plaintiff was terminated. Lobdell asserts that "[a]fter the 2016-2017 school year started, Kelahan called me to ask if I had instructed [Plaintiff]

---

[18] Plaintiff's statement that Kelahan, after learning of the 504 plan change, "did not indicate anything was wrong with what was done or planned," Krause Aff. ¶ 31, is also misleading. While technically true, it does not accurately describe what, according to Plaintiff's own testimony, actually happened: Plaintiff asked him whether there was "an issue" and he said, "I don't know" and walked out of the office. Krause Dep. at 208. This is certainly not the reaction of someone giving their approval after the fact.

that she could make changes to the 504 Plan for M.D. with M.D.'s parents, rather than by a 504 Committee meeting. I told him that I had never given her any such instruction or advice." Lobdell Aff. ¶ 26. Likewise, Lowell states she informed Kelahan about Plaintiff's unauthorized actions shortly after learning about them. Lowell Aff. ¶ 11. Plaintiff has not offered any evidence to counter what Lowell and Lobdell claim they told Kelahan. Consequently, there is not a disputed issue of material fact as to whether Kelahan thought Plaintiff had the approval of the special education directors when meeting with M.D.'s parent. As Defendants point out, because Kelahan is the only defendant that Plaintiff alleges directly discriminated against her, the fact that there is a disputed fact about whether Lowell and Lobdell—who are not parties to this action—lied about their interactions with Plaintiff regarding the 504 plan is not relevant to whether Kelahan acted in a discriminatory manner. See Reply at 6 n.1.

Having established that the 504 plan incident transpired, at least in relevant part, the way Defendants describe it, the Court now looks at whether this was the serious transgression Defendants claim it to be. Nearly all evidence in the record points to yes, and Plaintiff's attempts to create an issue of disputed fact are too vague and unsupported.

First, Defendants point to several regulations requiring that changes to a student's 504 plan be handled by a committee. See, e.g., 30 C.F.R. 104.35(c)(3) (requiring that "the placement decision is made by a group of persons, including persons knowledgeable about the child, the meaning of the evaluation data, and the placement options"); N.Y. Educ. Law § 4402 (noting specific, limited circumstances in which changes can be made, including, after the annual 504 plan review has been conducted, if "[t]he parent or person in parental relation makes a request to the school district for an amendment to the individualized education program and the school

district and such parent or person in parental relation agree in writing."). In turn, the school

policy follows the regulations:

> For a student who has been identified as disabled within the meaning
> of Section 504 and in need of special education or related aids and
> services, the 504 Committee shall be responsible for determining
> what special services are needed . . . All decisions involving
> placements of children protected under Section 504 must be made
> by a group of individuals, including persons knowledgeable about
> the child, the meaning of the evaluation data and the placement
> options.

Dkt. No. 78-44 ("504 Policy") at 2–3. Finally, several District employees familiar with the

process confirm that the District strictly adheres to this policy. Lobdell, who served as the 504

Coordinator for five years, stated that "[u]nder no circumstances may a single administrator,

such as a school principal, agree with a parent to make or even temporarily 'try out' changes to

the arrangements set forth in an IEP or 504 Plan" and that doing so would "violate the School

District's internal procedures." Lobdell Aff. ¶ 5. Lobdell added that she had worked with many

principals and that, other than Plaintiff "[a]ll were well familiar with the fact that changes could

not be made to an IEP or 504 Plan other than through a CSE meeting or a 504 Committee

meeting" and that, in her opinion, "a basic understanding of how IEPs and 504 Plans are created

and modified is an essential part of a principal's skill set." Id. ¶ 16. Likewise, Lowell, stated that

"District policy and procedure require that any changes to a student's 504 plan be adopted

though a 504 committee or subcommittee" and that "any principal who has been paying any

attention in the last thirty years should be well familiar with the fact that IEPs and 504 plans may

only be changed through properly convened committee or subcommittee meetings." Lowell Aff.

¶ 13. Lowell also stated that if Plaintiff "was not aware that what she was doing was wrong . . . it

indicates to me that she was not competent to perform services as the high school principal." Id.;

see also Dkt. 90-2 ("Anderson Affidavit") ¶ 10 ("The District policy and procedure for 504 plans

does not allow for 'minor' changes to be made without approval of a 504 committee. I am aware of no other instance in which such changes have been made without a 504 committee being convened.").

Plaintiff's Response does not seriously dispute Defendants' interpretation of the relevant law and policy.[19] Rather, in line with her assertion that Lowell and Lobdell told her to negotiate directly, Plaintiff claims that the school's de facto policy allowed for such changes. Pl.'s Add'l SMF ¶ 208. She claims that it "is very common to make minor changes to a student's 504 plan without a more formal CSE meeting as long as the student's parent or guardian consented to the changes." Id. However, the only source Plaintiff cites for this statement—which if adequately established, would inject doubt into Defendants' explanation—is the affidavit of Margaret Beck. Id. Beck, recall, was Plaintiff's leadership mentor, and at that time worked as an executive leadership coach at the Board of Cooperative Educational Services ("BOCES"). Beck Aff. ¶ 2. While Beck has an impressive educational resume, including twenty years as an elementary school principal, id., her testimony regarding the frequency of non-committee approved changes to 504 plans stated, in its entirety, "In my experience, it is very common to make minor changes to a student's 504 plan without a formal [committee] meeting as long as the student's parent or guardian consented to the changes." Id. ¶ 11. As Defendants point out, Beck does not state that this practice was common in the District, allowed under the District's policy, "or even that she has knowledge that it has ever happened in the District at all." Reply at 8. Accordingly, even

_____

[19] In her Responsive SMF, Plaintiff does state that the 504 Policy "does not, on its face, preclude the temporary adjustment of a 504 or testing of proposed changes." Pl.'s Responsive SMF ¶ 91. While it is true that the 504 Policy does not contain such a specific prohibition, Plaintiff fails to respond to Defendants' reliance on the 504 Policy's requirement that "[a]ll decisions involving placements of children protected under Section 504 must be made by a group of individuals." See 504 Policy at 2.

accepting Beck's statement on its face, it does not create a factual conflict with the host of evidence demonstrating that directly negotiating 504 plans was out of line with the District's policy and practice.[20]

### 2. Bell System

The bell system incident bears several similarities to the 504 plan change: Plaintiff initiated it herself at the start of the 2016 school year, failed to communicate the plan to others, and in her submissions to the Court, obfuscates the timeline to make it appear she gave significantly more notice than she did.

Defendants assert that at the beginning of the 2016–2017 school year, Plaintiff made the unilateral decision to forego the usual bell system used to notify students and teachers about the beginning and end of classes. Defs.' SMF ¶ 109. However, Plaintiff did not notify anyone that the bell system would not be used and instead "issued an e-mail immediately before the start of the school year attaching a schedule for the bells." Defs.' SMF ¶¶ 110–11; see also Dkt. No 78-38 (email with attached document titled "Opening Day Bell Schedule"). Plaintiff maintains that she notified Kelahan about the bell system changes, and that "Kelahan never relayed this information to the Board." Resp. at 12. But like the changes to the 504 plan, Plaintiff provided this "notice" after she had already implemented the change. Plaintiff states that "[o]n September 9, 2016, I advised Kelahan that the school was going to do without a bell system." But once again, the school year started on September 8, see School Calendar, and there were no bells on the first day of school, Defs.' SMF ¶ 111. Further, Plaintiff's claim that she informed Kelahan

---

[20] Plaintiff's assertion that M.D.'s parent was happy with the 504 plan change, see Dkt. No. 83-1, Ex. 3 (email from M.D.'s parent expressing concern that Plaintiff was asked to resign) is also unavailing. Defendants concerns did not relate to any particular parent; rather that the District could face serious legal trouble if the school were out of compliance with the 504 Policy. See, e.g., Defs.' SMF ¶ 101.

would not resolve the Board's gripe with her decision. As one member stated, the "Board's concern was that [Plaintiff] did not inform the Board herself that the bell system was being eliminated, and the Board members received expressions of concern and complaints of confusion over the elimination of the bell system when the Board members were not even aware that it had been eliminated." Anderson Aff. ¶ 5.

Plaintiff concedes that "this issue may merit discipline," though she argues that termination was far too harsh. Resp. at 16. But Defendants do not assert that they terminated Plaintiff for this reason alone, and the undisputed facts suggest that Defendants were justified in considering this in their list of grievances about Plaintiff's performance.

### 3.  Other Issues

While Defendants cite the 504 plan and bell system changes as the breaking point, they make clear that Plaintiff's performance had long been subpar. For instance, in the letter from Kelahan to Plaintiff outlining the reasons for why he recommended that she be terminated, he listed specific concerns from her evaluations, such as "has a limited communication repertoire and some key stakeholders are not aware of school goals," "only 'occasionally asks staff students, parents, or external partners for feedback,'" and neglects relationship building with district and external staff and doesn't have their support to get things done." Kelahan Letter at 1. Plaintiff disputes this characterization and claims she was an effective principal. Krause Dep. at 10.  While the Court will not analyze every potentially relevant incident in the record, it keeps in mind this broader context as it moves to the question about whether Defendants' proffered reasons were pretextual.

41

*ii. Were these Reasons Enough?*

Drawing all inferences in Plaintiff's favor, the Court finds that Plaintiff has not met her burden of showing that Defendants' explanation for her termination is false or inadequate. Plaintiff's § 1983 Equal Protection claim against Kelahan is therefore dismissed.

"[C]ourts must account for a § 1983 plaintiff's higher burden of producing evidence from which a jury could infer that the individual's discriminatory intent was a *'but-for' cause* of the adverse employment action." Naumovski, 934 F.3d at 214 (2d Cir. 2019) (emphasis in original). This means that "a plaintiff must establish that the employer's stated reason would not, alone, constitute a *sufficient* basis for pursuing an adverse action." Id. at 215 (emphasis in original). As discussed above, the undisputed evidence shows that Plaintiff was terminated because she ran afoul of well-established District procedure and made significant changes to the high school's day-to-day operations without notifying the Board. Plaintiff is unable to show that these reasons were "false" or "inadequate," and thus, they defeat her § 1983 claim. See id. at 217 (finding that district court erred in not dismissing § 1983 claim where plaintiff "has not produced competent evidence establishing that Defendants' stated reason for her termination—'performance reasons'—was false or inadequate").

However, there is an issue of material fact as to whether gender animus was a motivating factor in Plaintiff's termination. Hence, Plaintiff's Title VII and NYSHRL claims survive summary judgment.

For a Title VII or NYSHRL claim, "a plaintiff need not prove that the employer's explanation is false to prevail; plaintiff sustains his burden if he proves that an adverse employment decision was motivated by discrimination, regardless of whether he is able to additionally show that the employer's asserted justification for the decision was pretextual."

Dotson v. City of Syracuse, 763 F. App'x 39, 41 (2d Cir. 2019)) (internal quotation marks omitted); see also Naumovski, 934 F.3d at 213 ("Under Title VII, a plaintiff may succeed simply by establishing that sex (or another protected characteristic) was a motivating factor for any employment practice, even though other factors also motivated the practice. Therefore, even if an employer can establish that legitimate, non-discriminatory reasons also provided sufficient reason for the adverse action, the employer may still be liable under Title VII. In other words, an employer's insistence that he would have terminated the plaintiff anyway is no defense.").

Here, a reasonable jury could find that gender animus motivated Kelahan's decision to recommend termination. There are disputed issues of fact about whether Kelahan made several sexist statements, including one instance in which he said he hated working with women, and others in which he linked Plaintiff's gender to her poor performance or potential termination. Further, Kelahan admittedly wanted Plaintiff fired at an earlier date. Defs.' SMF ¶ 78; see also Krause Aff. 13–15. A reasonable jury could readily conclude that the gender animus evidenced by Kelahan's early comments also motivated his recommendation to terminate Plaintiff. For example, in Dotson, the Second Circuit reversed a district court's grant of summary judgment to a defendant on a Title VII gender discrimination claim because the district court improperly found that sexist remarks, made years after the date the plaintiff was disciplined, did not suggest a discriminatory motive. 763 F. App'x at 44–45 ("[A] reasonable juror could infer that when [Kleist] reported a female employee for insubordination following a short disagreement over parking, Kleist harbored the same views that he expressed explicitly just two years later. . . . ").

A reasonable jury could also rely on Kelahan's misstatement to the Board that Plaintiff was on a PIP in finding that gender bias was a motivating factor. While Defendants expend significant energy arguing that Plaintiff did in fact refuse to sign the PIP, see Defs.' Reply to

Pl.'s Responsive SMF ¶ 81; Defs.' Reply at 8–9, they do not dispute that the PIP was never implemented, see Kelahan Dep. at 49–50 ("We never signed [the PIP]. We never established a process by which we were going to implement it. We never really moved forward."). Consequently, regardless of the why the PIP never took effect, there is no dispute that Kelahan's statement to the Board that Plaintiff was on a PIP is false. This could be, of course, as Kelahan described it, merely an "oversight." Or a reasonable jury could find that Kelahan's misstatement was irrelevant because the Board placed no stock in whether Plaintiff was on a PIP or not. See Dkt. No. 90-2 ("Anderson Reply Affidavit") at 11–12 ("Whether or not [Plaintiff] had been put on a 'principal improvement plan' was not a matter that was significant to the Board when she was terminated. Had the Board been notified that [Plaintiff] was never placed on a principal improvement plan, the decision would still have been to terminate her."); see also 90-3 to -5 (Reply Affidavits of Graziadei, Kernan, and Mayo) at 11–12 (same). But even if the Board did not rely on that piece of misinformation, the fact that Kelahan relayed that misinformation could provide further evidence that his recommendation to terminate Plaintiff was motivated by more than her professional shortcomings. See Weiss v. JPMorgan Chase & Co., 332 F. App'x 659, 663 (2d Cir. 2009) ("Inconsistent or even post-hoc explanations for a termination decision may suggest discriminatory motive").

### iii. Other Defendants

Defendants also argue that the gender discrimination claims against the Individual Defendants should be dismissed. SJ Mem. at 16, 19 n.6. To the extent they argue for dismissal because Plaintiff has failed to show that Kelahan was motivated by gender bias, that argument is unavailing.[21] Further, their argument that "individual Board members could not be liable for

---

[21] Defendants' argument that the Board should be dismissed on this ground is also unavailing. See id.

intentional discrimination" under NYSHRL "when they did not intend to discriminate," id., attempts to revive an issue already addressed by the Court, see Apr. 2018 MDO at 19–20. Because Defendants' one-sentence argument does not include any legal citation or otherwise expand on the previously addressed arguments, the Court will not consider the issue further.

Defendants also point out that Board member Hanna voted against termination and that Beaver, Courtney, Hoehn, and Rothdeiner were no longer on the Board at the time of the vote. SJ Mem. at 19 n.6. Defendants therefore request that the NYSHRL gender discrimination claim against these members be dismissed. Id. Plaintiff's response to Defendants' arguments about individual Board members appears to address only her hostile work environment claims. See Resp. at 16–17. Therefore, the Court dismisses Plaintiff's NYSHRL gender discrimination claims against Hanna, Beaver, Courtney, Hoehn, and Rothdeiner.[22]

## B.  Hostile Work Environment (Title VII and NYSHRL)

### 1.  Timeliness

Defendants first argue that the hostile work environment claims—brought under Title VII and NYSHRL—should be dismissed as untimely. The Court disagrees.

Hostile work environment claims against a school district or its officers brought under NYSHRL are subject to a one-year statute of limitations. N.Y. Education Law § 3813(2-b);

---

[22] The Court previously dismissed Plaintiff's § 1983 claims against the Municipal Defendants because Plaintiff failed to allege that the deprivation of her constitutional rights was caused by "caused by a governmental custom, policy, or usage of the municipality." Apr. 2018 MDO at 22 (quoting Jones v. Town of East Haven, 691 F.3d 72, 80 (2d Cir. 2012); see also Monell v. Dep't of Soc. Servs. of N.Y.C., 436 U.S. 658 (1978). The Court also dismissed Plaintiff's § 1983 claims against all Individual Defendants except Kelahan because, "[t]he Second Circuit has not held that the cat's paw theory applies in the context of a § 1983 claim." Kregler v. City of New York, 987 F. Supp. 2d 357, 366 (S.D.N.Y. 2013).

Amorosi v. S. Colonie Indep. Cent. Sch. Dist., 9 N.Y.3d 367, 369 (2007). A Title VII claim for

hostile work environment must be based on conduct that occurred within three hundred days of

the filing of a charge with the EEOC. 42 U.S.C. § 2000e-5(e)(1) ("[S]uch charge shall be filed by

or on behalf of the person aggrieved within three hundred days after the alleged unlawful

employment practice occurred."). "This statutory requirement is analogous to a statute of

limitations." Benbow v. State Univ. of New York-New Paltz, No. 11-CV-870, 2014 WL

1871863, at *5 (N.D.N.Y. May 8, 2014) (Kahn, J.) (quoting Van Zant v. KLM Royal Dutch

Airlines, 80 F.3d 708, 712 (2d Cir.1996)). "However, under the 'continuing violation' doctrine,

'a claim that the plaintiff suffered a hostile work environment . . . is timely so long as one act

contributing to the claim occurred within the statutory period.'" Id. (quoting Sanderson v. N.Y.

S. Elec. & Gas Corp., No. 13-CV-1603, 2014 WL 1243854, at *2 (2d Cir. Mar.27, 2014)). "[F]or

the doctrine to apply, those acts outside the 300–day window must be sufficiently related to a

timely act so as to constitute a single hostile work environment." Id.

    The parties argue at length about how to calculate the relevant time frames. For

Plaintiff's NYSHRL hostile work environment claim, Defendants assert that because Plaintiff

filed this suit on August 23, 2017, she must show one instance of harassment occurred after

August 23, 2016 (and before her termination on September 20, 2016).[23] SJ Mem. at 18. And

because Plaintiff filed her EEOC Complaint on February 21, 2017, see EEOC Complaint at 1,

Defendants claim she must show that at least one instance of gender-based harassment occurred

on or after April 27, 2016. Id. at 18. Plaintiff disputes these dates, arguing that the limitations

---

    [23] As the Court noted in its April 2018 MDO, "[i]t is well-settled that certain adverse
employment practices such as termination . . . are discrete acts and cannot be considered as part
of an ongoing pattern or policy of discrimination." Robles v. Cox and Co., Inc., 841 F. Supp. 2d
615, 628 (E.D.N.Y. 2012).

periods were tolled while her EEOC Complaint was pending. Response at 22–23.

However, even if the Court were to accept the narrowest time frame put forth by Defendants—August 23, 2016 to September 20, 2016—Defendants themselves list several disputed factual allegations that Plaintiff "could arguably place after August 23, 2016," and that a reasonable jury could find constitutes the "one instance of gender based discrimination" required under the continuing violation doctrine. See Response at 22. Specifically, Defendants acknowledge that Plaintiff alleged that Kelahan called her a bad parent "multiple times" and that, therefore, Kelahan may have done so during the relevant time frame.[24] SJ Mem. at 22; see Krause 50-h Hr'g at 17. Defendants argue, however, that the Court should not invoke the continuing violation doctrine based on these comments because they do not "carry any indicia of gender bias." But as discussed above, a reasonable jury could find that these alleged comments were gender-biased. See Sanderson, 560 F. App'x 88, 92 (2d Cir. 2014) (noting that "a harassing incident need not be overtly sex-based"). Additionally, this act is indisputably related to the other alleged acts that predated the relevant time frame. Indeed, part of Plaintiff's hostile work environment allegation is that Kelahan repeatedly called her a bad parent.

In sum, because a reasonable jury could find that "one act contributing to the claim occurred within the statutory period" and the "acts outside the 300–day window [are] sufficiently related to" it, Plaintiff's Title VII and NYSHRL hostile work environment claims are timely. See Benbow, 2014 WL 1871863 at *5.[25]

---

[24] Defendants do not argue that Plaintiff lacks the evidence to show that any "bad parent" or other discriminatory comment was made during the relevant time frame. See SJ Mem. at 22–24.

[25] Defendants also repeat their argument from their motion to dismiss briefing that, because Plaintiff's EEOC Complaint also listed the New York State Division of Human Rights in the caption, see EEOC Complaint at 1, Plaintiff "elected" her remedy with the Division of Human Rights, and is thus barred from pursuing this action in this Court. SJ Mem. at 29 (citing

### 2. *Severity and Pervasiveness*

With the continuing violation doctrine in effect, the Court next considers whether, based on the totality of Plaintiff's allegations, a reasonable jury could find that she was subject to a hostile work environment.

To establish a hostile work environment claim, a plaintiff must show she faced harassment "sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment." Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). "This standard has both objective and subjective components: the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." Littlejohn v. City of New York, 795 F.3d 297, 321 (2d Cir. 2015) (citing Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014)). The incidents giving rise to a hostile work environment must also have "occur[ed] because of an employee's . . . protected characteristic." Rivera v. Rochester Genesee Reg'l Transp. Auth., 743 F.3d 11, 20 (2d Cir. 2014) (quoting Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001)). The standard is the same under

---

Legg v. Eastman Kodak Co., 670 N.Y.S.2d 291, 292 (1998) ("Under Executive Law § 297 (9), a person claiming to be aggrieved by unlawful discriminatory practices may elect to seek redress in either administrative or judicial forum; once complainant elects administrative forum by filing complaint with Division, subsequent judicial action on same complaint is generally barred."). However, as the Court noted in its April 2018 MDO, a complaint filed with the EEOC that the EEOC then cross-files with NYSDHR "is not deemed to be an election of administrative remedy." Apr. 2019 MDO at 15 (quoting Melendez v. Int'l Serv. Sys., Inc., No. 97-CV-8051, 1999 WL 187071, at *13 (S.D.N.Y. Apr. 6, 1999)). The Court went on to explain that it would not "dismiss Plaintiff's HRL claims based on nothing more than the caption of her state court complaint. It is possible, for instance, that Plaintiff's counsel listed both EEOC and DHR in the caption of the state court complaint simply to reflect the fact that EEOC automatically cross-filed her grievance with [NYS]DHR." Id. at 16. Defendants do not assert any new facts or arguments to support their contention, see SJ Mem. at 29; Defs.' SMF ¶¶ 148–151, and, thus, as before, the Court will not dismiss Plaintiff's NYSHRL claims on this ground.

Title VII and NYSHRL. <u>Facci-Brahler v. Montgomery Cty.</u>, No. 18-CV-941, 2020 WL 360873, at *5 (N.D.N.Y. Jan. 22, 2020) (Kahn, J.).

In order to demonstrate that the conduct to which she was exposed was sufficiently severe or pervasive, a plaintiff may show that "a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." <u>Cruz v. Coach Stores, Inc.</u>, 202 F.3d 560, 570 (2d Cir. 2000) (citation and quotation marks omitted), <u>superseded by statute on other grounds</u>, Local Civil Rights Restoration Act of 2005, N.Y.C. Local Law No. 85. "[C]ourts should examine the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance." <u>Rivera v. Rochester Genesee Reg'l Transp. Auth.</u>, 702 F.3d 685, 693 (2d Cir. 2012).

Here, Plaintiff has alleged several incidents that directly support her claim that she suffered pervasive, workplace-condition altering harassment because of her gender.[26]

As discussed, Plaintiff alleges that Kelahan often criticized the way Plaintiff raised her daughter, repeatedly calling Plaintiff a bad parent or mother. Krause 50-h Hr'g at 17. Plaintiff also alleges that Kelahan "mocked things in [Plaintiff's] office as 'girly' and 'stupid.'" Krause Dep. at 85. She also claims that Kelahan told her "your family is such a distraction. You're not

---

[26] Defendants claim in their Reply that Plaintiff did not respond to Defendants argument in their SJ Motion that the allegations of harassment were not "severe or pervasive" enough for a hostile work environment claim. Reply at 9. While it is true that Plaintiff did not provide legal arguments for why the alleged harassment was severe and pervasive enough, Plaintiff provides several pages of factual allegations to support this proposition. Response at 18–21. Thus, because this is not a case "[w]here abandonment by a counseled party is not explicit but such an inference may be fairly drawn from the papers and circumstances viewed as a whole," <u>Jackson v. Fed. Exp.</u>, 766 F.3d 189, 196 (2d Cir. 2014), the Court does not deem this claim abandoned.

able to do a good job because of your family," and on another occasion stated that "you're not allowed to talk about your daughter, because it's your passive aggressive way of getting me not to fire you." Krause 50-h Hearing at 20–21. Further, Kelahan allegedly once berated Plaintiff until she started crying and then stated, "It's what I hate about working with women, so emotional." Krause 50-h Hr'g at 94; Krause Dep. at 91

In addition to these overtly discriminatory statements, Plaintiff also alleges that Kelahan continually treated her in a disrespectful, sometimes aggressive manner. She testified that Kelahan's verbal criticism was so intense it reduced her to tears over twenty-five times. Krause Dep. at 82–83. Once, when Kelahan was frustrated that Plaintiff failed to make an announcement he requested, he threw a stack of papers at her and said, "take these while I go do your fucking job." Krause Dep. at 106. On another occasion, Kelahan was trying to find Plaintiff and screamed about her in such a disconcerting manner that it was part of the reason Appler brought her concerns about Kelahan to the Board. Appler Dep. 19–26.

Defendants argue that only the explicitly sexist statements should be considered: "Plaintiff has not controverted the evidence that Kelahan could lack tact with male employees as well as with female employees, showing that the facially non-gender-related incidents she cites did not have a hidden basis in gender bias." Reply at 10. This argument fails for several reasons. First, even accepting that the undisputed evidence showed Kelahan "lacked tact" with male employees, a reasonable jury could find that Plaintiff's allegations constitute much more than a lack of tact. Second, it remains in dispute whether Kelahan was more aggressive and disrespectful toward Plaintiff than male employees. See, e.g., Zumbrun Dep. at 10–12 (noting that Kelahan treated Plaintiff more disrespectfully than past male principals); Appler Dep. at 14 (noting that while Kelahan was disrespectful to all, he was "more in attack mode" with Plaintiff).

50

Third, and most important, courts have made clear that language or actions do not need to be overtly discriminatory to contribute to a hostile work environment—especially when there when there were also other, more overt instance of discrimination.

Aman v. Cort Furniture Rental Corp., 85 F.3d 1074 (3d Cir. 1996), is particularly instructive on this point. In that case, the Third Circuit reversed a district court's grant of summary judgment to a defendant furniture store facing a Title VII hostile work environment claim. First, as cited above, the court found that supervisors had used implicitly racist language. Id. at 1083. Then, after noting that the plaintiffs "testified to numerous other examples of harassment which, viewed in isolation, arguably may not have been motivated by racial animus," the court held that "[i]n light of the suspicious remarks discussed above, a reasonable jury could interpret this behavior as part of a complex tapestry of discrimination when examined in conjunction with the comments made by [Plaintiffs' employer]'s employees and management." Id.

The Second Circuit has voiced its approval of Aman's pragmatic assessment of discriminatory intent. In a recent zoning discrimination case, it quoted Aman at length in approving of a district court's finding that certain comments had been "code words for racial animus:"

> Anti-discrimination laws and lawsuits have 'educated' would-be violators such that extreme manifestations of discrimination are thankfully rare . . . . Regrettably, however, this in no way suggests that discrimination based upon an individual's race, gender, or age is near an end. Discrimination continues to pollute the social and economic mainstream of American life, and is often simply masked in more subtle forms.

Mhany Mgmt., Inc. v. Cty. of Nassau, 819 F.3d 581, 609 (2d Cir. 2016) (quoting Aman 85 F.3d at 1081–82); see also Alfano v. Costello, 294 F.3d 365, 378 (2d Cir. 2002) ("Facially neutral

incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on sex. But this requires some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory."); Howley v. Town of Stratford, 217 F.3d 141, 156 (2d Cir. 2000) ("Given the contents of Holdsworth's [overtly sexist] April 12 barrage, a factfinder would be entitled to infer that any harassment Holdsworth directed at [plaintiff] thereafter, with or without obscenities, was gender-based.").

Accordingly, taking all the evidence into account, a reasonable jury could find that—while not extreme as some cases in which a hostile work environment has been found—the alleged incidents were sufficiently severe or pervasive to create an abusive environment and occurred because of Plaintiff's gender. In Whidbee v. Garzarelli Food Specialties, Inc., for instance, the Second Circuit found that a court erred in granting summary judgment to a defendant on this issue, noting that "plaintiffs were subjected to, or at the very least aware of, a stream of racially offensive comments over the span of two to three months" and that while the "harassment here was not as severe as that in many other cases[,] [w]e have reminded district courts, however, that 'the appalling conduct alleged in prior cases should not be taken to mark the boundary of what is actionable.'" 223 F.3d 62, 70–71 (2d Cir. 2000); see also id. at 70 ("the District Court held that Corliss's conduct was not severe or pervasive because it did not render the plaintiffs' jobs 'unendurable' or "intolerable.' The bar is not set so high, however. While a mild, isolated incident does not make a work environment hostile, the test is whether the harassment is of such quality or quantity that a reasonable employee would find the conditions of her employment *altered for the worse.*) (additional quotation marks omitted; emphasis in original).

The Second Circuit cases on which Defendants rely—Fleming, Littlejohn, and Demoret—are unpersuasive. While the plaintiffs in those cases relied on many of the workplace slights that Plaintiff asserts, unlike these plaintiffs, Plaintiff also alleges related, more serious incidents of degrading and discriminatory behavior. In Fleming v. MaxMara USA, Inc., the court noted that plaintiff had only offered evidence of one racially motivated incident, and "d[id] not allege any fact to connect this comment to her other allegations of unfair treatment, which are not facially related to her race." 371 F. App'x 115, 119 (2d Cir. 2010). Likewise, in Littlejohn v. City of New York, the plaintiff merely accused her supervisor of a series of rude but minor acts, such as using "impatient and used harsh tones," "declin[ing[ to meet with" the plaintiff, and "wrongfully reprimand[ing]" her. 795 F.3d 297, 321 (2d Cir. 2015). And finally, in Demoret v. Zegarelli, the plaintiff's allegations that the defendant was "reviewing her budget with a fine-toothed comb and his criticizing her for being five minutes late to department meetings even though male employees could skip meetings with impunity" were simply too trivial to rise to the level of a hostile work environment. 451 F.3d 140, 150 (2d Cir. 2006). The fact that similar workplace slights were insufficient when they constituted the entirety of the allegations does not mean that the same slights are irrelevant in a case, as here, where they accompany more serious allegations. See Williams v. Gen. Motors Corp., 187 F.3d 553, 563 (6th Cir. 1999) ("The [severe or pervasive] analysis cannot carve the work environment into a series of discrete incidents and measure the harm adhering in each episode. Rather, a holistic perspective is necessary, keeping in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created thereby may exceed the sum of the individual episodes.") (brackets in original); see also Alfano, 294 F.3d at 378 (citing Williams's analysis on this issue).

In sum, the Court concludes that Plaintiff has met her burden to bring this claim to a jury. The jury will be free, of course, to find that Kelahan did not make the alleged comments, that Plaintiff was unusually sensitive to criticism, that Kelahan harassed men and women alike, or that Plaintiff's hardships during her tenure were simply due to her own ineptitude. But Plaintiff has put forward enough evidence to counter that narrative, and it is the jury's role to weigh the disputed material evidence and assess the parties' credibility. See Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 439 (2d Cir. 1999) ("Reasonable jurors may well disagree about whether these incidents would negatively alter the working conditions of a reasonable employee. But the potential for such disagreement renders summary judgment inappropriate.").[27]

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Summary Judgment Motion (Dkt. No 78) is **GRANTED** as to Plaintiff's § 1983 claims against Kelahan; NYSHRL gender discrimination claims against Hanna, Beaver, Courtney, Hoehn, and Rothdeiner; and hostile work environment claims against Defendant Hoehn; and it is further

**ORDERED**, that Defendants' Summary Judgment Motion is in all other respects **DENIED**. The following claims may proceed to trial: Title VII gender discrimination and hostile

---

[27] Defendants argue that the NYSHRL hostile work environment claims against Beaver, Courtney, Hoehn, and Rothdeiner should be dismissed because they were no longer on the Board when the relevant time frame began on August 23, 2016. SJ Mem. at 22 n.8; Defs.' SMF ¶¶ 13–16 (stating that Hoehn served until June 30, 2015 and that Beaver, Courtney, and Rothdeiner served until June 30, 2016). But even assuming this is the correct time frame, Defendants' argument fails because the Court has applied the continuing violation doctrine, which expanded the relevant time frame to include the former Board members' tenures. However, because Plaintiff predicates the Board members' liability on the notice they received of Kelahan's abusive behavior from Appler, who brought her concerns to the Board in March 2016, see Resp. at 17–18; Pl.'s SMF ¶ 174–75, the hostile work environment claim against Hoehn, who was no longer on the Board at that time, is dismissed.

work environment claims against the Oriskany Central School District and the Oriskany Central School District Board of Education; NYSHRL gender discrimination claims against Kelahan, Appler, Graziadei, Mayo, Kernan, and Anderson; and NYSHRL hostile work environment claims against Kelahan, Appler, Graziadei, Mayo, Kernan, Anderson, Hanna, Beaver, Courtney, and Rothdeiner; and it is further

**ORDERED**, that Hoehn is **TERMINATED** as a defendant in this action; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

DATED:          May 29, 2020
                    Albany, New York

Lawrence E. Kahn
Senior U.S. District Judge